Your Honors, the only case in the docket this morning is 2-24-0188, Petitioner, Nowicki and Lawrence Walker v. Kinseth v. Otis Elevator Co. Otis Elevator Co. third-party plaintiff's appellant, the advocate, Sheridan Hospital, third-party defendant's attorney. Arguing on behalf of the appellant, Mr. Jonathan M. Fryman. Arguing on behalf of the attorney, Mr. Kyle H. Leck. All right. Good morning, counsel. And, Mr. Fryman, whenever you are ready, you may begin. Thank you, Your Honor. Good morning, and may it please the Court. Good morning. I'm going to turn my phone on just so I have a timer so I can see how much time I've used. Your Honors, this case presents the question of whether the trial court properly held that Otis, as the third-party complainant, had sufficient notice under Illinois case law to bring a third-party claim against Sherman Advocate at the time of the deposition of the plaintiff when her medical records were present at the deposition, and where there was a hearsay statement in her medical records saying that she, as a layperson, believed that there was a power surge in the elevator. That, of course, is something that she refuted during the deposition, said that she had never said that to her doctor. Mr. Fryman, before we get on too far, I noticed there were a couple of signatures on the actual brief. Did you prepare the brief, or was it prepared by co-counsel in this case? We prepared it together, Your Honor. Well, I've stricken briefs like yours in the past that were less offensive. You have argument everywhere that it doesn't belong. You have it in the statement of facts, you have it in the nature of the case, and that's not how we practice here in Illinois. So I would be careful if you're going to be coming back and practicing in the appellate court in Illinois. Let me begin with an apology then, Your Honor. To be said that we did miss elements of the court's practices, I deeply regret that. I doubt that they allow it in Connecticut either, but we do not allow it here. And I certainly would love to hear from, Your Honor, the portions that I should not discuss during argument because I don't want to waste your time. Well, could I ask in that vein?  Where in the record is it Deal? Ray Deal? Yes, Your Honor. Where is his death? Is it in the trial court record? The deposition is not itself in the record. The subpoena of his deposition is in the record. So to the extent that the questions go to the question of what Deal said at his deposition and that that's not part of the record on appeal, I understand that concern, and I won't refer to Mr. Deal's testimony during this argument. Well, that was one of them, but there were some others, too. Okay. Thank you, Your Honors. So let me go to this question. You know, we have this hearsay statement in the medical record, which is then refuted by the supposed declarant at her own deposition. But really the question goes to the question of what is the standard. Suspecting that someone has done something wrong and that there may someday be a cause of action is not the standard under Illinois case law. The standard which is set forth not only in Mitzias but in other cases is whether, in fact, the complainant, the plaintiff, has facts known to them to support what that suspicion is. Now, the mere fact that an elevator has jumped a few floors and someone alleges that they were injured when it does does not in any way give someone facts that there has been a power outage. Certainly when that person then refutes the stance. You're talking about developing facts. That's what you're trying to do with this issue, correct? You want to develop facts. We want to develop the facts. That's correct, Your Honor. And shouldn't that process of developing facts have begun with knowledge that this happened? The process of developing facts began, of course, when that record came, when the medical record came. So then the plaintiff's deposition was noticed. The plaintiff's deposition was taken. The plaintiff refutes that she ever said that. At that point, we essentially have nothing. You just shut it down then? No, we did not shut it down at all, Your Honor. And the Record on Appeal does reflect a series of depositions and document requests. Again, the contents of the particular depositions are not all in the record, but you can see all the subpoenas. There is very serious discovery that's ongoing against Sherman Advocate that follows Ms. Nowicki's deposition. Let me ask, when did that first report from Dr. Barkley become known? I could not find the date as we looked through this record. Did it happen early on? Did it happen close to the deposition, which would have been three years after, four years after the event? When did Dr. Barkley's notes become or were given to the Nowickis? I don't believe that that is part of the record, Your Honor, and I'm not personally familiar with what that date was. But I do know, in response to Your Honor's question, that there was follow-up by document requests and depositions, including, again, the subpoena for deal is in there. You can see that. We're talking about late 2019 at this point. It's only a few months after that, of course, that the pandemic hits, and there are the expected difficulties of deposing frontline health care workers during the early stages of the pandemic. Eventually, though, we do get the deposition of Kevin Pirtle, the preventive maintenance mechanic, which we had to issue a subpoena just to get even his contact information. But eventually we do, and we're able to depose him, and he surprises everyone. He says there's a whole history of power surges going back for 10 years, and they're facility-wide. This is not just something limited to the elevator. This is something across Sherman Advocate, and he's their guy. And once he says that, at that point, it's not just a suspicion that we have. At this point, we have facts that we possess, reasonable facts that we can base a complaint on. So the complaint is brought then promptly following Kevin Pirtle's deposition, certainly within the two years following Kevin Pirtle's deposition. And Kevin Pirtle's deposition is followed by someone else from Sherman Advocate. At this point, we're far enough into the pandemic that we are able to get the person who worked in the same department as Ms. Nowicki, who says, yes, there were power surges. Now, she's a layperson. She's not a preventative maintenance mechanic, but she says, you know, I saw them all the time here. So at that point, we have two different people from Sherman Advocate, and we go ahead and we file the third-party complaint. And then they go back and they say, no, it's when that document came in with Ms. Nowicki. She's not an electrical engineer. She doesn't know whether there was a power surge just because the elevator dropped. Well, you know, power surge is kind of an interesting phrase. I suspect that when the elevator is falling rather rapidly and not doing what it's supposed to do, it feels like a power surge. So could that have possibly been what she was feeling as opposed to what she knew? It could have been what she was feeling, although, again, she refutes that she said that to the doctor. But assuming that she did say that, it might have been what she was feeling. Just like if I'm sitting in a room and the only light in the room is a lamp and suddenly the light goes out, I can think, oh, we lost power. Maybe just the light bulb died or maybe someone flipped a switch in the next room. I don't know. But I, as someone who doesn't know about these things, might think that the power went out. She, as someone who doesn't know about these things, might think it was a power surge. All she really knows is she was in a black box that was traveling, and all of a sudden it traveled more quickly, and she claims to have been injured by that. And so if she did say that there was a power surge, that's not actionable. That's not a good-faith complaint to base it on that. So we waited until we had the good-faith basis. And, you know, it's telling. If you go back to that Mitzias case, there you had an expert, a plaintiff's expert in that case, who was deposed twice and the first time said the anesthesia delivered by power pump is highly correlated or highly associated, I forget which precise verb it was, with the cartilage loss that the plaintiff in that case was suffering. And the appellate court here in Illinois said, well, that's a fact question as to whether there was enough to know you should go after the pain pump manufacturer. It's only at the second deposition of the expert where that expert says, you know, now the science is there. The use of the pain pump to deliver that anesthesia and the cartilage loss. And the court says, well, that's a fact question. Let the jury or the fact finder or whatever it was in that case determine that. You can show them nowhere near that. Here we just have this hearsay statement by a layperson which is refuted by the supposed declarant. I have a couple questions. One, is it fair or correct to give credit to the argument of your opponents that Otis is an expert? And so, therefore, Otis should know, should have a, I mean, I may be mischaracterizing what they said in the brief, but Otis should have a checklist right away. When an elevator falls, then they know it might be bop, bop, bop, bop, bop. And is that of record, I guess it is?  And two, what do you make of that argument? Well, I'm not aware of there being something on record about Otis being an expert in power searches or anything like that. And I think you're asking – Whether you're functioning or malfunctioning on, you know, elevator. I think that's the issue. That's the argument as I understood it. Yes, Your Honor. I think it's fair to say that Otis as an elevator manufacturer and maintainer is an expert in the maintaining of elevators and the creation of elevators. But that's not really the question here. I mean, you may be asking, did Otis act diligently in investigating whether that one of a hundred different causes for a problem in an elevator was the cause that happened here in response to your earlier question, your colleagues' earlier question. I indicated they did. They sent out all the document requests. They deposed people repeatedly until they came to Kevin Pirtle, and Kevin Pirtle admitted it. And then they came to Ms. Sheehan, who admitted it as well. So, you know, to the extent that there's a fact question of, should there have been greater diligence done by someone who knows the field? I mean, if that's a fact question, it's a fact question. This was resolved as a matter of law in a motion to dismiss. I don't see how that can hold up. And I will say, too, there's an obvious and I think undisputed error in the trial court's two-paragraph order dismissing this third-party claim, which is the judge says power surges with an S. There's a plural, and he's backtating it. There's certainly nothing in the record about anyone ever saying there was more than one power surge until we get to Kevin Pirtle. But what the judge is doing is he's taking that knowledge he later has, I'm sure, inadvertently, and adding the S to surges. Surges is something that, well, you really should have moved quickly, because now there's some indication of negligence, right? Anything can happen once. That doesn't mean you have a basis for alleged negligence. You need notice. You need to know that there's a recurring problem, or at least that you knew there might be a problem. That's what the S does in that order. And again, there's absolutely nothing in the record to indicate that there was anything about surges. Thank you. One follow-up is that in your motion for leave to file, the third party, you said, I don't know that I have the order right, but we took the death of Dr. Barkley, who testified according to the medical records, her records, that the plaintiff said something about a surge. Two, there's a World Comp claim pending. Three, I think you talked about the cabin portal death, which is obviously within the statute of limitations. But what is it about the first two things? One, the World Comp case, I'm guessing, had been in existence probably since her injury, the plaintiff's injury. And the deposition of Dr. Barkley was really, I didn't go through it in such detail that I saw where she was asked, if she was asked, do you remember this, or are you just testifying from your records, which in my experience is often what doctors are doing. But they're usually asked that, in which case the fact that it was supposed, I think, it's not a record as Justice Hutchinson determined, but the deposition plaintiff seems to inquire of the plaintiff in such a way that it suggests you have the record in 2019, I think her death was taken. Is it fair to use that supposition that you must have had the record then, and if it triggered you when you took Dr. Barkley's step, couldn't or shouldn't? Maybe there are two questions there. Couldn't or shouldn't that have triggered you when you saw the record, I guess? And I know what you've indicated, that is not of record, and I'm not inquiring further on that. So, just to take, as I understand it, three different things that you've mentioned. One is, Clivell's deposition, obviously, were within the statute of limitation if that's the triggering event. Two is the workers' comp claim. Obviously, a workers' comp claim is not a claim that the employer was necessarily at fault in any particular way. That's the way workers' comp works, right? I was at work, I worked there, I was hurt. That's workers' comp. That really tells us nothing about the third-party complaint, but there it is in your motion for leave to file. Well, right, there's acknowledgment. Everyone knows she was hurt at work, everyone knows that she worked there, but that doesn't tell us that Sherman Advocate was necessarily negligent. No, but again, it was in the motion of Otis for their leave to file the third-party complaint. Right, we don't deny that we knew there was a workers' comp claim. What we deny is that the existence of a workers' comp claim in any way suggests that there was negligence on the part of Sherman Advocate in the maintenance of its electrical supply to its facility. Those are very different things. So I don't think the one gives you notice of the other. Otherwise, people would have to sue the employer all the time based just on speculation. That would be the exact kind of speculation that Mitzius includes. So that your motion for leave to file should not be read as pointing out to the trial court why you were filing the third-party complaint. And when I say you, I mean, I don't know if you were there at trial, but, you know, why you should be allowed to file the third-party complaint at this time. You don't think that the motion should be read that way? No, I think, and there's. . . Let me answer the question. Thank you, Your Honor. And I think this goes back to the Katz case and the other cases regarding the balancing test in terms of discovery, the discovery trigger for the statute of limitations. The point here is that Sherman Advocate was actually on notice of the existence of this accident all along. So there's no prejudice to them because they've been participating in things all along. They've had to preserve their records. They've known, you know, which witnesses might be relevant, et cetera. I have one other question. When was the. . . Well, all right, let's start with this premise, that elevators get inspected regularly and not just because of accidents on a regular basis. And I'm not worried about when that happened in this case, but when was the first time that Otis had anybody in there, you know, feet on the ground actually looking at this elevator? The record shows that there were inspections before the accident happened. He got a clean bill of health. After the accident happened, he got a clean bill of health. So from Otis' perspective, from its own records, there wasn't a problem with the. . . Well, but what is this inspection that occurs in 2020? It seems to be pointed out. There's no record of what they found at this point, I believe, in this record, but there is a reference to the fact that in 2020, an investigation of this particular elevator was taken in earnest, maybe. We'll call it that. I'm not sure what Your Honor is referring to, the inspections. Obviously, the alleged injury here was in 2015. Right. And the inspections that are most likely most relevant in terms of the underlying case are those that occurred before and after in 2015. Well, I guess my question then is, did representatives of Otis appear right after the accident and look at that elevator? Not for regular inspections, but for what occurred that day. I don't know, Your Honor, and I don't believe that's present on the record of the third-party complaint.  Justice Perkins? Justice Mueller? I understand I have five minutes for rebuttal. You will have an opportunity to reply if you choose to do so. Thank you. Mr. Fleck? Good morning, Your Honors. Good morning. Counsel, and may it please the Court, My name is Kyle Fleck, and I represent the Apple Lead in this matter advocate, Sherman Hospital. And I'm here to request that this Court affirm the trial court's ruling in granting our motion to dismiss. As this Court is well aware, the discovery rule is not intended to provide a party with a second light on the apple. Rather, it is designed to encourage all parties to investigate all known or suspected potentialities so as not to belabor and protract litigation and to prevent parties from being in jeopardy in perpetuity. In this case, I understand Otis's frustration, as it has been put in a precarious position by prior counsel who chose not to investigate a known issue of an alleged power surge that was known to them at the latest of 2019. I'm sure that Otis is currently But why? Okay, known to them by what instrument or what circumstance? Several sources, Your Honor. One would be the medical records of Dr. Barkley that Your Honor has referred to today, which included a statement from the plaintiff on the date of the incident about what happened. And while counsel may say that's a hearsay statement, it is not. It is a present-sense impression of the plaintiff about what happened on the date of her injury, and it is also a recorded recollection of a business record taken in the course of ordinary business. Beyond that, But does the record establish when Otis got that medical record? No, Your Honor, it does not. Okay. And so Advocate was not part of this lawsuit. So really you're asking us to say by their questioning of the plaintiff, you should assume that they had it. I would even say presume, Your Honor, if I may. And that's because they would question her directly about the medical records on her deposition on April 5, 2019. Now, the lawsuit was filed, I believe, two years before that. And we've all been in litigation, and sometimes discovery can take a while, but I think it's fair to presume that they had this information, at least as of the deposition date, if not long before, since counsel for Otis was clearly prepared on this issue and questioned her on it directly. Should an issue like this be based upon what we presume from the record? Well, Your Honor. Or should it be testimony at a hearing? I think you're right, Your Honor. And so even if we take April 5, 2019 as the latest date that Otis was on knowledge of this issue. Was that the date of the plaintiff's death? That's correct, Your Honor. And they're still well past the statute of limitations, even in the application of the discovery rule, to file against Advocate on June 23, 2023. That's over four years later. But then you really are asking us, as you say, and I appreciate your vigor, presume that they had it. Does it matter, then, that the plaintiff refuted it? I never said that. I don't know what caused my injury. I don't know why the elevator fell. Does that matter? I mean, if that's important, then wouldn't it also be important that she denied she ever said that? Well, I don't believe that she denied that she said that a power surge occurred. What she was asked was, do you recall this conversation from three and a half years ago? And she said that she did not recall that specific conversation. But she also said, I don't know, didn't she? I believe I read that. Yeah, I think it's a little bit unclear in the testimony about whether she's saying, I don't know, and recalls specifically that conversation, or whether she was talking about the power surge specifically. But it is in the record, and she was questioning about it. Counsel talked about all of the subpoenas that Otis sent out, and some of those were to Advocate. Advocate provided the inspection and maintenance records for this unit from August 2011 through August 2016. And in those records, as they admit in their brief, there was an incident that involved another power surge on this same elevator. And that is another source of information that Otis had that they chose not to act on. May I ask you, as long as there's a little break, what I also ask opposing counsel, what in the record, not in your argument, establishes Otis's expertise such that the information or data points that you direct us to should have put them on inquiry notice? Well, it's not, to answer your question directly, I can't point to something in the record. But it is well established that Otis is an expert in the elevator industry. I guess that's my question. What establishes that in the record? Well, your Honor, as I said, it's not necessarily in the record, but if you do research on the company, they've been established since 1853. It's a matter of common knowledge, and we can take judicial notice of that fact. Thank you, Your Honor. Yes, exactly. And so given that they are experts in this field, the idea that they had multiple sources of knowledge of a power surge occurring that caused the plaintiff's injury, and that somehow that that was not connected to the electrical system at the hospital, is a red herring to say the least. Otis argues that the electrical power system at Sherman is large and complex and a problem confined to a singular elevator does not, without more, implicate the entire system. What do you say about that? Well, I don't believe that there's anything in the record that can demonstrate that that's actually the case. But even if that was the case, as Your Honor was asking earlier about the inspection in 2020, which was still able to happen despite the pandemic, the inspection was for the experts of the parties in the case at that time, which was the plaintiff and Otis. And despite having their expert there, well, we don't know what their expert did. They haven't disclosed them yet, but they haven't provided any information in the record to substantiate how it is that a power surge in one elevator and in an elevator in which a prior occurrence of this had already happened, which they were aware of, is not connected to the electrical system at the hospital, despite how complex it might be. Again, they are a sophisticated party who should be aware of these issues. And under the law in Illinois, they had a duty to investigate because they were on reasonable notice of this from multiple sources. Well, and maybe then you can answer my question. Is there any other evidence that shortly after this particular incident that Otis or someone on their behalf was looking at this elevator related to this incident as opposed to just a regular inspection? Your Honor, I wish I could provide you with that. Since we were not at it until June 23rd of 2023, we were not privy to all the discovery. And so that information isn't available to me. And I did not see that Otis provided it as part of their record. Doesn't this, I mean, your response here earlier talking about what we presume, doesn't that all lead to the need for a hearing on the question of fact about what Otis knew and when did they know it? Well, I believe we've already had that hearing, and that was on the motion to dismiss. And Otis was able to… It was not an evidentiary hearing, was it? You're correct, Your Honor. It wasn't. But Otis was afforded the opportunity to provide all of the information to the trial court. This case has been litigated for over seven years. And in doing so, the trial court still found that as of April 5th, 2019, at the latest, Otis was on notice of this issue of the power search because their prior counsel directly questioned plaintiff on this at her deposition. And they also had the incident report involving the same subject elevator, as they mentioned in their brief. Now, counsel… Has the trial court found that fact? I'm sorry? Trial court found that fact? The trial court found on the fact of April 5th, 2019… Should we give deference to that? I believe so, Your Honor. So this is not a de novo review? I believe by the legal standard it is, but I would still give some deference to the trial court in their ruling, simply because it is based on the facts that are known in this case. And Otis cannot escape the fact that their own counsel questioned plaintiff on this power search issue that was included in the medical records, that was included in another incident report that they were aware of, and then waited more than four years to join Advocate into the lawsuit. They also waited more than three years to question Mr. Kirtle. And counsel says the pandemic prohibited him from doing so, but they were able to participate in the inspection that I mentioned. But also, his deposition was on July 22nd, 2022. Why was there the delay? Even after the pandemic, into mid-2021, there was a year after that that they chose not to question him. And also, why did they question him on this? They had not provided a reason. It wasn't as if Otis came across additional information that then led to the questioning. No, prior counsel was removed and new counsel was substituted in, in 2020. He reviewed the file and then said, oh, what is this power search issue? And based on that, chose to start questioning witnesses about it. Unfortunately, however, that was simply too late. It was more than six years after the lawsuit was filed and more than three years after the plaintiff had already testified about this. And as the trial court held, additional depositions in 2022 appear to have added to Otis' knowledge of the alleged power searches is of no moment. And I do believe that that is correct because they were already aware of information prior to that and chose to let it stagnate for years. One argument that Otis also made in the brief is that power outages and surges are a common occurrence in Illinois. Well, if that is the case, then that should have put them on further notice that this was an issue that needed to be investigated. Yet they still chose not to investigate that issue either. I want to talk about the Macias case a little bit. Counsel mentioned it earlier and how I read the whole thing is that the court held that the statute of limitations could be told in that case under the discovery rule because the plaintiff could not be aware of that source because the causal link was as yet unknown to science. They went on to say the plaintiff should not be held to a standard of knowing the inherently unknowable. Of course, that makes complete sense. Here, however, Otis was aware of this. Not only was it known to science that a power surge could be caused by a problem in the electrical system, but they were directly aware of the power surge issue for multiple sources, as I've already discussed. Now... Well, a power surge could be caused by a lightning strike, too, which would be nature. I mean, do we even have any of that information in this record about what else was going on at that particular time? We do not, Your Honor, and I agree. But if there was a lightning strike that struck the electrical system that caused a power surge, I still do believe that they are connected because in order for a power surge to occur, there has to be a sudden burst of electrical energy through the electrical system. And counsel gave the example, oh, if one light goes off, then how am I to assume that that was a power surge? Well, he also called the elevator a black box. So when all of the lights go off and the elevator starts free-falling, it is fair for the passenger, the plaintiff here, Ms. Nowicki, to presume that a power surge occurred. And that's why she stated that when she was asked about it with her doctors, regardless of whether or not she remembered that specific conversation of her three and a half years later. But getting back to Macias, again, it's a known fact, and it's within the scientific realm for them to have been aware of this, again, because they are such a sophisticated party. Now, in their brief, Otis claims that they doggedly pursued the power surge, but was unable to do so because the advocate was obfuscating the facts. Well, to the contrary. Advocate provided Otis with all of those inspection records and incident reports that I mentioned earlier. They had made the unit available for the inspection in 2020. And Advocate has also made its employees available for deposition throughout the course of this litigation, despite the fact that they'd asked for certain employees not until six years after this litigation was filed. Did Advocate ever prevent Otis from entering this place prior to 2020? So I can't point to something specific in the record to say that they did not prevent them. However, I imagine if that were to be the case, then Otis Council would have raised that issue. But given that Advocate is the owner and operator of the building that works in conjunction with Otis, and it is in Advocate's best interest to have safe and efficient elevators, again, it's fair to presume that Advocate would work in conjunction with them to allow them to inspect the elevator and then even have an expert inspection in terms of the litigation. I also think that Otis's reliance on Fox is misplaced, the Society of Mount Carmel versus Fox case. Their defendant contractor built a building and continued to tell the plaintiffs for years that, oh, these are just maintenance problems, maintenance problems, no big deal. Six years later, an investigation was held into the building and structural defects were found. And the court held that because the plaintiffs were misled about the cause of the issues in the building and there was a report that solidified that there were structural issues, that the statute of limitations would appropriately be told to the time when it is that the report came out. But we don't, I mean, the statute does not require, and the case law does not require that this evidence that's going to be used is new, does it? No. No, that's correct, Your Honor. But it does require due diligence, and it encourages plaintiffs to investigate all known and suspected causes of an injury or malfunction. And that was the case here. I agree that Fox is a little bit different. But, you know, no party has made any conclusions about the cause of this incident. As I said, there are experts on that. I'll just say that there has not been a report evidencing the fact that a power surge actually caused this. Otis is merely speculating on that to begin with. So with that, Your Honors, unless there are any more questions. All right. Just a moment. No, thank you. And just to forget, I don't have any either. Thank you very much, counsel. All right. Mr. Freiman, if you want to proceed, you may do so. Thank you. I think I'd like to start with the last line, where opposing counsel said all Otis has is speculation. You know, speculation is not enough to bring a third-party complaint under Metsios and many of this Court's cases. You need to have facts known by the plaintiff or the complainant. The fact that opposing counsel is saying that even now it's just speculation is a very strong indicator of the fact that if Otis had brought the claim at the time of the deposition of Nowicki, that certainly would have been speculation. I disagree. I don't think it's pure speculation now. I think now there is a factual basis for the claim after Kevin Coyle's testimony. But one thing I think is obvious here, there are so many factual questions that are the subject of the colloquy between this Court and counsel for both sides, that this is something that ought to go to a factual hearing, as it did in Katz and in many of the cases that we cited in our briefs. I guess his point, though, was at least one of his points in that regard was there was argument and there was introduction during that argument by both sides, I would assume, depositions that had been taken, anything that had been investigated to that time, although it's still unclear what, if anything, had been. But were there disagreements as to the facts that were being identified at that hearing? Well, the Court's ruling was not about diligence. It was, as a matter of law, the fact that the plaintiff said in her medical record that there had been a power surge was enough to put Otis on notice. So the judge below was not saying, I have considered all of the facts and I'm making factual findings about Otis's diligence. That would have been maybe something for summary judgment. It wouldn't have been something for a motion to dismiss in any event. But if there's a factual question about diligence, I mean, there were all sorts of statements that were being made about what happened and whether, in fact, someone was allowed to have a deposition or not. And I respectfully disagree and think those are not supported by the record or they're not present in the record before this Court. As I said, we had to issue a subpoena just to get the contact information for Kevin Pirtle. So if the question is, was Otis acting diligently in deposition to get the information, to get to the point where it had the facts it needed to bring a good-faith complaint, which it got when it deposed Kevin Pirtle, then that's a question that is a question of fact. Diligence is a question of fact unless it's so obvious. And I would say on the record before this Court, it's certainly not so obvious that Otis didn't continuously send out document requests, continuously seek depositions, and ultimately get someone who finally told the truth, which was Kevin Pirtle, who was then buttressed by Cindy Sheehan, who said that there were these regular surges and outages. I just want to run through a couple of very quick points. First of all, Mount Carmel-Fox case was mischaracterized. The Court explicitly said we're only going to address one issue. We're not going to the fraudulent concealment question, which was briefed by the parties. We're just doing it based on discovery. When did you really know? You really knew when the report came out about the building in that case. Just like in Mitius, you really knew when the science came out. And it's not a question of, oh, this is a case about science or this is a case about reports. It's just about discovery. When have you learned enough to bring a good-faith complaint? And here, we learned enough to bring a good-faith complaint when it's opposed to Kevin Pirtle. Remember, respectfully, Your Honors, Ms. Bewicky was a layperson who couldn't have possibly known about any kind of power surge, so the only thing that could have been triggered by her saying that, whether or not she refuted it, was Otis acting diligently. So we're back to that question of whether, factually, there was diligence by Otis here, something that I don't think this Court can say, no, Otis was not diligent on the record as it exists. Maybe I misunderstood what you just said. How could you say she wouldn't have known about a power surge but for the activity of Otis? I mean, she saw the doctor right afterwards. Otis wasn't talking to her before that, were they? No, she wouldn't have known that there was a power surge just because the elevator dropped suddenly. Well, as I said, she's falling several floors. To her, it might have felt like a power surge. So even if she said it, that doesn't necessarily mean it's what we're thinking of a power surge, but it's still something that she – there are some issues about did she say it, did she mean it, did she remember it. And so that still seems to require a hearing where the judge can listen to the witnesses or listen to the experts testify. And that did not happen, did it? That did not happen, Your Honor, no. And I understand and agree with Your Honor that insofar as there's a question about diligence, it's a factual question to be remanded to the trial court. Thank you very much. All right. Thank you very much. I thank you, counsel, for your argument this morning. We do appreciate it to clarify some points in the record, such as it is at this point in time. And we will take the matter under advisement, enter a decision in due course.